## UNITED STATES v. MAMMOTH OIL CO. et al.

### TEAPOT DOME CASE.

(District Court, D. Wyoming. June 19, 1925.)

No. 1431.

1. **Mines and minerals ⬱5—Bill to cancel oil lease held to sufficiently charge fraud.**

In suit to cancel a lease of naval reserve oil lands, bill, though emphasizing allegations of conspiracy more than averments of specific fraudulent acts, *held* to allege such acts sufficiently to fully apprise defendants of the charges to be met.

2. **Mines and minerals ⬱5—Oil company held responsible for acts of its organizer in obtaining lease.**

Oil company, taking lease of naval reserve oil lands from the government, pursuant to negotiations carried on with officers of the government by its organizer, who was charged with conspiracy with one of such officers to defraud the government, *held* so far his creature as to be responsible and liable for his acts in the transactions.

3. **Mines and minerals ⬱5—Validity of executive order held immaterial on question of validity of lease.**

The validity of an order of the President vesting in the Secretary of the Interior the administration and conservation of naval reserve oil lands, which by Act June 4, 1920 (Comp. St. Ann. Supp. 1923, § 2804i), the Secretary of the Navy had been directed to conserve, develop, use, and operate, *held* immaterial as respected validity of a lease of such lands, where, despite the activities of the Interior Department in the negotiations preceding the execution of the lease, such negotiations were actively participated in, if not dominated by, the Secretary of the Navy and his designated representative of that department.

4. **Mines and minerals ⬱5—Evidence held insufficient to sustain charges of fraud in obtaining lease.**

In suit to cancel a lease of naval reserve oil lands, charged to have been executed as the result of a conspiracy to defraud the government between the Secretary of the Interior and the organizer of the lessee corporation, evidence *held* insufficient to sustain the charges of fraud.

5. **Mines and minerals ⬱5—Failure of Secretary of Interior to seek advice of particular officers as to validity of proposed lease held not to sustain charge of fraud.**

That the Secretary of the Interior, in negotiations for leasing of naval reserve lands, refused to seek advice of the Solicitor in his department or the Attorney General, was at most an error of judgment, and would not support a charge of fraud, where, when legal advice was thought necessary, such advice was sought and received from the Judge Advocate General of the Navy.

6. **Evidence ⬱83(3)—Presumed that required steps observed in making lease of naval reserve oil lands.**

A government grant, such as a lease of naval reserve oil lands, is clothed with the presumption that the preceding steps required by law have been observed.

7. **United States ⬱124—Entitled to no greater consideration than private litigant.**

The government, as the plaintiff in a case, is entitled to no greater consideration with respect to the burden of proof, the quantity and character of evidence, and presumptions of law and fact, than a private litigant.

**8. Fraud ⊂⇒58(1) — Must be clearly established.**

Allegations of fraud must be established by clear, unequivocal, and convincing proof.

**9. Evidence ⊂⇒60—Construction making act legitimate and honest preferred.**

Where two constructions may be placed on an act, that construction which will make it legitimate and honest will be preferred.

**10. Evidence ⊂⇒76—When presumption from failure to testify arises stated.**

The rule that, where a litigant has certain substantive facts within his knowledge and refuses to reveal them, the presumption arises that such facts, if revealed, would be against him, goes no further than to raise such presumption, where the facts sought to be inferred are laid at his door, or placed by the evidence clearly within his knowledge, and where sufficient proof has been introduced to sustain a prima facie case without the indulgence of the inference.

**11. Evidence ⊂⇒76—Failure of corporate defendant's organizer to testify held to raise no presumption of fraud.**

In suit to cancel lease of naval reserve oil lands as having resulted from conspiracy to defraud the government between the Secretary of the Interior and S., who organized the corporate lessee, where it appeared that corporations in which S. was interested had purchased oil through another corporation, whose profits were invested in government bonds, which were later found in the possession of the son-in-law and partner of the Secretary of the Interior, failure of S. to testify *held* to raise no presumption that the transaction was fraudulent.

**12. Mines and minerals ⊂⇒2 — Authority of Secretary of the Navy respecting naval reserves defined; "conserve."**

Act June 4, 1920 (Comp. St. Ann. Supp. 1923, § 2804i), directing Secretary of the Navy to take possession of properties within naval petroleum reserves, and conserve, develop, use, and operate them in his discretion, directly or by contract, lease, or otherwise, and use, store, exchange, or sell the products, uses the word "conserve" in its larger meaning of saving from loss, and not in its more limited meaning of holding in the ground, and thereunder the Secretary may conserve, develop, use, and operate all at the same time, and may use, store, exchange, and sell, or any of them, in his discretion, in carrying out the general purposes of the act.

**13. Mines and minerals ⊂⇒5—Secretary not governed by statutes governing contracts in leasing oil lands.**

Under Act June 4, 1920 (Comp. St. Ann. Supp. 1923, § 2804i), directing the Secretary of the Navy to take possession of and conserve, develop, use, and operate naval petroleum reserves, directly or by contract or lease, the Secretary, in leasing such lands, is not controlled by general laws requiring advertising for bids for fuel for the navy, construction of storage tanks by competitive bidding, and at places designated by Congress, etc.

**14. Statutes ⊂⇒225½—When specific legislation affected by general legislation stated.**

Specific legislation in relation to a particular class or subject is not affected by general legislation in regard to many classes of subjects, of which that covered by the specific legislation is one, unless it clearly appears that the general legislation is so repugnant to the special legislation that the legislators must be presumed to have intended thereby to modify or repeal it.

**15. Mines and minerals ⊂⇒5 — Secretary, in leasing oil lands, authorized to contract for exchange of royalty oils for oil in storage.**

Act June 4, 1920 (Comp. St. Ann. Supp. 1923, § 2804i), authorizing Secretary of the Navy to develop naval petroleum reserves, and exchange or sell oil and gas products thereof, authorized the Secretary, in leasing such lands, to contract for exchange of royalty oils derived therefrom for fuel oil in storage.

**16. Mines and minerals ⊂⇒5—Provision of naval reserve oil lease for issuance of certificates for royalties held authorized.**

Provision of a lease of naval reserve oil lands for issuance by the lessee, in payment for royalty oils, of certificates which could be exchanged for fuel oil in storage or redeemed in cash, was within the power of the Secretary of the Navy, under Act June 4, 1920 (Comp. St. Ann. Supp. 1923, § 2804i), authorizing him to exchange or sell oil and gas products of such lands, as against contention that it provided for a sale without providing that proceeds should be turned into the treasury.

**17. Mines and minerals ⊂⇒5—Statutes held not to show policy to retain naval reserve oils in the ground.**

The act of Congress authorizing the President to withdraw oil lands from entry (Act Feb. 25, 1920 [Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ff, 4640¼g–4640¼ss]), providing for development of oil lands under leases, and Act June 4, 1920 (Comp. St. Ann. Supp. 1923, § 2804i) authorizing the Secretary of the Interior to conserve, develop, use, and operate lands within naval petroleum reserves, do not show any such policy on the part of the government to retain oils in its naval reserves in the ground as rendered it illegal for the Secretary to make a single lease covering the whole of one of such reserves.

**18. Evidence ⊂⇒99—Records of brokers and banks held inadmissible, as res inter alios acta.**

In suit to cancel a lease of naval reserve oil lands, as having resulted from conspiracy to defraud the government between the Secretary of the Interior and S., in which it appeared that corporations in which S. was interested had purchased oils through another corporation, which invested its profits in bonds, which were afterwards in possession of a son-in-law and partner of such Secretary, books and records of brokers and banks concerning the handling of such bonds *held* inadmissible, as res inter alios acta.

**19. Constitutional law ⊕=62 — Congress may delegate unrestricted authority over government property.**

While Congress has the constitutional power to regulate the manner in which property of the United States, such as naval reserve oil lands, shall be handled by the executive branch of the government, it may, by appropriate legislative authority, in the exercise of such power, designate officers of the executive department to handle such property in an unrestricted way and in accordance with a vested discretion.

In Equity. Suit by the United States against the Mammoth Oil Company and others. Bill dismissed.

Atlee Pomerene, of Cleveland, Ohio, Owen J. Roberts, Sp. Counsel, of Philadelphia, Pa., and Albert D. Walton, U. S. Atty., of Cheyenne, Wyo., for the United States.

John W. Lacey, of Cheyenne, Wyo., Martin W. Littleton, of New York City, George P. Hoover, of Washington, D. C., G. T. Stanford, of New York City, Herbert V. Lacey, of Cheyenne, Wyo., R. W. Ragland, of New York City, J. W. Zevely, of Washington, D. C., and Cravath, Henderson & De Gersdorff, of New York City, for defendant Mammoth Oil Co.

Edward H. Chandler, of Tulsa, Okl., for defendants Sinclair Crude Oil Purchasing Co. and Sinclair Pipe Line Co.

KENNEDY, District Judge. This is a suit in equity, in which the United States seeks to cancel and annul a lease upon certain oil lands, commonly known as Teapot Dome, located in the county of Natrona, state of Wyoming, purporting to have been made on behalf of the plaintiff by the Secretaries of the Navy and Interior Departments with the principal defendant the Mammoth Oil Company, upon the ground, first, that said lease was executed as the result of a conspiracy to defraud the plaintiff, between one Albert B. Fall, the then Secretary of the Interior, and one Harry F. Sinclair, who negotiated the lease on behalf of said Mammoth Oil Company; and, second, that said lease was executed without authority of law.

### The Pleadings.

The bill of complaint sets forth the corporate capacity of the defendants, the description of the property involved, of which plaintiff is the owner, the official capacities of Secretaries Fall and Denby, the Act of June 4, 1920, under which the lease is purported to have been made, and the executive order of May 31, 1921. It is alleged that the executive order was invalid and illegal, and that it was obtained under representations and persuasions of Secretary Fall, as Secretary of the Interior, upon which the President acted, and that said representations were false, and made for the purpose of placing Fall in a position to transact government business in connection with oil lands with Harry F. Sinclair, the promoter, organizer, officer, and large stockholder of the defendant corporation the Mammoth Oil Company. Then is alleged the execution of the lease by Secretaries Fall and Denby, in pursuance of and in reliance upon the executive order, together with an allegation that the lease is null and void and effected without authority in law, a copy of the lease being attached to the pleading. The agreement of February 9, 1923, supplemental to the agreement of April 7, 1922, is set forth, coupled with an allegation that that contract is void for the reason that its terms were being carried out without advertisement or competitive bidding. It avers that under the lease the Mammoth Oil Company entered into possession of the lands in controversy, explored and drilled them for oil, and took over the oil so found, and will continue to do so unless restrained, and that it has trespassed upon the property of the plaintiff. It is alleged that the defendant has issued certificates as in the agreement provided, and that the certificates have been illegally used in the payment of construction work of storage tanks in different parts of the United States.

The bill then sets forth that Fall and Sinclair conspired and confederated to defraud the United States by the execution of the lease, and that in pursuance of said conspiracy they did certain unauthorized and unlawful things, among them being: The preliminary negotiations of Fall, purporting to act under the executive order; the negotiation and conclusion of the agreement between the government and the Mammoth Oil Company; the awarding of the lease and the subsequent construction work under the agreement of February 9, 1923, without advertising and competitive bidding; that Edwin Denby, the Secretary of the Navy, took no part in the negotiations of the contract of April 7, 1922, exercised no discretion in regard thereto, and affixed his signature thereto as a colorable attempt in the exercise of his discretion; that other persons and corporations were desirous of obtaining a lease, but were denied an opportunity and discouraged from bidding, of which fact the Mammoth Oil Company was cognizant, and in which Sinclair conspired with Fall to that end; that Fall refused to take the opinion of the Solicitor of the Department of the In-

terior or the Attorney General of the United States in regard to the legality of the lease; that Fall communicated to Sinclair, acting for the defendant Mammoth Oil Company, that he would not make a lease upon the land unless Sinclair should present a quitclaim deed for mining claims asserted to a portion of the land in controversy, which claims Fall then knew were worthless; that Sinclair secured and lodged with Fall, as Secretary of the Interior, a quitclaim deed from said claimants, some of which were held by a company which was a competitor of Sinclair desiring to become a bidder for the lease; that Fall, with intent to stifle competition and acting with the knowledge of Sinclair, made the obtaining of quitclaim deeds a condition precedent to receiving any offer for said lands or to granting a lease upon said lands; that Fall agreed with one Shaffer to see that Sinclair set apart a portion of the lands in controversy for the benefit of Shaffer in accordance with a prior agreement with Sinclair, and as a condition precedent to receiving a lease upon the premises; that Fall fraudulently caused information concerning the agreement before and after it was made to be kept secret and concealed from his associates, from Congress, and from the public; that in negotiating and concluding the agreement Fall and Sinclair, acting for and in behalf of the Mammoth Oil Company, did fraudulently conspire and confederate, and in furtherance thereof did defraud the United States, by granting the lease in violation of law to favor and prefer the Mammoth Company over other persons desirous of taking a lease, and give to the Mammoth Company the right to receive and take to exhaustion all oil and gas in the lands, and to lease the lands at an inadequate, improper, and fraudulent consideration; that the lease of April 7, 1922, and the agreement of February 9, 1923, are fraudulent and illegal, and of no force and validity against the plaintiff; that the agreement of April 7th constitutes a lien, incumbrance, and cloud upon the title of the plaintiff, which plaintiff is entitled to have removed; that the defendant company should make discovery in the nature of an accounting as to its transactions under said lease; that the defendant Sinclair Crude Oil Purchasing Company and the Sinclair Pipe Line Company claim to have some interest in said lands, but that in fact they are trespassers upon them; that the plaintiff is without an adequate remedy at law, and that the resort to a remedy in equity will prevent a multiplicity of suits.

The prayer of the petition is for a re- straining order, the appointment of receivers, a final injunction against the defendants, a decree nullifying the agreements of April 7th and February 9th, a decree for an accounting, a decree ousting the Sinclair Crude Oil Purchasing Company and the Sinclair Pipe Line Company from the lands, and other equitable relief.

The answers of defendants, while long, amount practically to denials of the allegations of conspiracy and fraud, and affirmance of the regularity and legality of the lease and agreement and the transactions surrounding them.

### The Facts.

A somewhat extended review of the facts presented upon the trial, together with those of which it is urged the court should take judicial notice, will undoubtedly be necessary before beginning a discussion of the legal points contended for by opposing counsel. While one basis of the relief sought revolves around and is determinative solely upon the surrounding facts, a rather unusual situation exists in the case, in that there are scarcely any of the facts and circumstances in dispute; each party relying upon its own combination of facts to sustain its conclusions as to what inferences should be drawn therefrom. Thus the court is confronted with the duty of assuming that substantially all the evidence is true, which in turn will undoubtedly require a careful consideration of all the evidence, in order to give both sides of the controversy fair treatment. While some of the facts have been accentuated by counsel for plaintiff, and others by counsel for defendants in their briefs, the court will endeavor to present all the facts considered material to a decision of the issues, whether mentioned by counsel or not, as near as may be, in their chronological order, in order to gather a full perspective of the entire situation.

For a considerable period of time prior to the year 1909 the lands of the United States chiefly valuable for petroleum deposits were open to entry under what is commonly known as the Placer Mining Act, which permitted the location of mineral claims upon the public domain, ripening into a property right upon the discovery of oil, which might be extracted to exhaustion without the payment of any royalty to the United States as owner. Union Oil Co. v. Smith, 249 U. S. 337, 39 S. Ct. 308, 63 L. Ed. 635. In the year 1909 the government began what is apparently a new policy in dealing with at least some of its mineral lands, for in that

year by presidential orders certain portions of the public domain, having been characterized as proven oil lands, were withdrawn from entry. There being some question about the legality of this executive order, which legality, however, was subsequently sustained by the Supreme Court, Congress passed an act permitting the President by order to withdraw such lands, and they were again withdrawn by a second presidential order in the year 1910. These tracts so withdrawn were scattered over different portions of the country, and among them was the structure over which this controversy arises. As there is no dispute about the lands, it will not be necessary to set them forth in detail, but suffice it to say that they are located in townships 38 and 39, range 78 west of the sixth principal meridian.

These lands under the withdrawal order rested in status quo until April 30, 1915, when by executive order they were constituted a naval petroleum reserve known as No. 3, to be held for the exclusive use and benefit of the United States Navy. Then followed another interim of nondevelopment of the petroleum lands of the government until February 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ff, 4640¼g–4640¼ss), when the so-called Mineral Leasing Act was enacted by Congress, which provided generally for the development of lands chiefly valuable for petroleum and other certain kinds of mineral owned by the government under the form of leasing said lands. Lands within naval reserves were excluded from the operation of the act, except as to a provision for the leasing of wells within such reserves.

The next governmental step was in the enactment by Congress of the Act of June 4, 1920, relating to the naval petroleum reserves, under which act the lease in controversy is purported to have been made, as set forth in plaintiff's bill, and is as follows:

"That the Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes, and on which there are no pending claims or applications for permits or leases under the provisions of an act of Congress approved February 25, 1920, entitled 'An act to provide for the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain,' or pending applications for United States patent under any law; to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States: And provided further, that the rights of any claimant under said Act of February 25, 1920, are not affected adversely thereby: And provided further, that such sums as have been or may be turned into the treasury of the United States from royalties on lands within the naval petroleum reserves prior to July 1, 1921, not to exceed $500,000, are hereby made available for this purpose until July 1, 1922: Provided further, that this appropriation shall be reimbursed from the proper appropriations on account of the oil and gas products from said properties used by the United States at such rate, not in excess of the market value of the oil, as the Secretary of the Navy may direct." 41 Stat. 813. (Comp. St. Ann. Supp. 1923, § 2804i).

After the passing of the General Leasing Act, the Interior Department, under regulations adopted by authority of the act, proposed to lease lands in the Salt Creek field adjacent to the Teapot Dome upon showing of preferential rights authorized by it. It appears that there was a substantial portion of this oil land area in this vicinity which was not claimed, testified to by Judge Finney, Assistant Secretary of the Interior, as being 6,400 acres. On March 3, 1921, under the direction of the then Secretary of the Interior, John Barton Payne, this unclaimed oil land was directed to be offered for leasing at public auction to the highest bonus bidder, the royalties being fixed by the department.

On March 5, 1921, Secretaries Denby, of the Navy, and Fall, of the Interior Departments, took office. On March 31, 1921, an executive order was signed by President Harding, committing the lands in the naval petroleum reserves to the Interior Department for administration, in consultation and co-operation with the Secretary of the Navy. This executive order appears on page 18 of plaintiff's bill as Exhibit A, in the following language:

"Under the provisions of the act of Congress approved February 25, 1920 (41 Stat. 437), authorizing the Secretary of the Interior to lease producing oil wells within any naval petroleum reserve, authorizing the President to permit the drilling of additional wells or to lease the remainder of any part of a claim upon which such wells have been drilled, and under authority of the act of Congress approved June 4, 1920 (41 Stat.

912), directing the Secretary of the Navy to conserve, develop, use and operate, directly or by contract, lease or otherwise, unappropriated lands in naval reserves, the administration and conservation, of all oil and gas bearing lands in naval petroleum reserves Nos. 1 and 2, California, and naval petroleum reserve No. 3 in Wyoming, and naval shale reserves in Colorado and Utah, are hereby committed to the Secretary of the Interior subject to the supervision of the President, but no general policy as to drilling or reserving lands located in a naval reserve shall be changed or adopted except upon consultation and in cooperation with the Secretary or Acting Secretary of the Navy. The Secretary of the Interior is authorized and directed to perform any and all acts necessary for the protection, conservation, and administration of the said reserves subject to the conditions and limitations contained in this order and the existing laws or such laws as may hereafter be enacted by Congress pertaining thereto."

The first draft or memorandum of this order appears to have been made by Judge Finney, then First Assistant Secretary of the Interior, and from the testimony offered was the outgrowth of a desire to secure the machinery and experience of the Interior Department in handling public lands, the administration of which had never before been committed to the Navy Department. Previous to the completion of the document it was submitted to the Navy Department, and certain modifications made, after which it was carried to the President by Assistant Secretary of the Navy Roosevelt and the President's signature secured to the same.

Some time prior to the middle of June, 1921, it was apparently discovered that drainage was taking place in naval reserves Nos. 1 and 2, located in California, and there was a granting of strip leases to protect against this, coupled with a settlement of certain adverse claims held by the United Midway Company, by the granting of leases on certain sections. On July 8, 1921, during the negotiations over the California leases, Secretary Fall addressed a letter to one Doheny, in which it appears that he had been having some conflict with officials in the Navy Department, and stated that he had the matter arranged so that he would have no further conflict with these officials, but would consult only the Secretary himself in regard to matters pertaining to the naval reserves.

On July 23, 1921, with respect to what should be done with the oil from offset leases on reserves in California, Secretary Fall asked Secretary Denby for instructions concerning the handling and disposition of the royalty oil resulting, in which letter the suggestion was made that there might be an exchange of the royalty oil for fuel oil, or for fuel oil in tanks, the title to both to be vested in the Navy. On July 29th the Secretary of the Navy addressed a letter to the Secretary of the Interior, approving the suggestion for the taking care of the oil resulting from the California leases.

Sometime in the early part of September, 1921, Dr. H. Foster Bain, then, and at the time his evidence was taken in this case, Director of the Bureau of Mines under the Department of the Interior, in company with Arthur W. Ambrose, holding at the time the position of Chief Petroleum Technologist in the Bureau of Mines, made a trip to the Rocky Mountain region, visited naval reserve No. 3, interviewed one Carroll H. Wegemann, formerly in the government service, and one G. A. Fisher, of the firm of Fisher & Lowrey, consulting geologists and engineers, located in the city of Denver. A full discussion of the conditions existing in naval reserve No. 3 was had, in which Dr. Bain, Ambrose, Wegemann, and Fisher participated. Recent maps were exhibited in which changes in the geological formation in Teapot Dome were indicated, showing faults at a different location than those having before been represented to the government by Wegemann while in its employ.

Later in September, 1921, the said Wegemann made a report to the Geological Survey that a further examination of the Teapot Dome had convinced him that his previous examination made in 1916 was faulty, in that he was convinced that the saddle was located farther south upon the structure, making a greater area of the structure susceptible to drainage. The substance of this report was communicated to the Paymaster of the Navy, and to Commanders Stuart and Shafroth, in the Bureau of Engineering of the Navy, that bureau apparently having charge of the naval reserves. About the 1st of October, 1921, Admiral John K. Robison was made Chief of the Bureau of Engineering in the Navy Department by the Secretary of the Navy. On October 8, 1921, by an oral direction of the Secretary of the Navy, Admiral Robison took direct charge of the naval reserves. A short time thereafter the appointment was confirmed by a formal written order.

It seems that some feeling had been developed between Secretary Fall and Commanders Stuart and Shafroth, which the evidence discloses was the opposition in the

Navy Department referred to in Fall's former letter to Doheny, but that Admiral Robison, under date of October 8, 1921, issued an order from the Bureau of Engineering retaining Commander Stuart in his position on account of his knowledge of the naval reserves. This action was later confirmed by the Secretary under letter of October 24, 1921.

Admiral Robison testifies that the first thing he did, after being placed in charge of the Bureau of Engineering, was to get in touch with the officials of the Interior Department, Secretary Fall, Assistant Secretary Finney, Dr. Bain, of the Bureau of Mines, and Ambrose, the Chief Petroleum Technologist. He informed Secretary Fall that he had been placed in charge of the naval reserves. He consulted with Dr. Bain, of the Bureau of Mines. He consulted with Commander Stuart, to familiarize himself with the history of the reserves. His investigation led him to the conclusion that, while one of the California reserves was practically nonexistent as a reserve on account of checkerboarding, the other reserve was suffering from very serious drainage, and that No. 3 reserve was pretty secure, but not absolutely so.

Some time in October, 1921, which time is not more definitely fixed, there was a conference between Admiral Robison, Secretary Fall, Dr. Bain, and Mr. Ambrose, in which, among other things, the possible drainage of naval reserve No. 3 was discussed. At that time the second Wegemann report was before these officers, and it was agreed that it at least suggested an investigation of the conditions surrounding the possibility of drainage, and it was determined that a representative of the Bureau of Mines would be dispatched. The conclusion of the Wegemann report, contained in paragraph 3, is as follows:

"(3) There is no doubt that, from the point of development of the property and recovery of oil from it, it will be much better to develop the property as a unit before the invasion of water. The Navy Department cannot prevent draining of the property as outlined above. It can make arrangements for the proper development of the property under conditions which will be mutually advantageous to the Navy Department and the operators."

One Heald was an officer consulted in making the investigation of Teapot Dome, he being a geologist of the Bureau of Mines or the Geological Survey. The examination by Heald was made about the middle of November, 1921, and his report was dated on or about the middle of November of the same year. The substance of this report appears to be that there was no immediate danger of substantial damage on account of drainage, because of the fact that there were few wells immediately adjoining the reserve, but that, if loss became imminent, due to intensive drilling near the line of the reserve, fractions should immediately be leased. The testimony of Heald discloses that he must have made a limited examination of that portion of the reserve where the saddle was supposed to be located, as he was upon the ground, according to his own testimony, only about four hours, and was engaged chiefly in checking the later report of Wegemann in regard to the location of the saddle.

On or about the 30th day of November, 1921, there was held in the Navy Department what is described as the Secretary's Council, consisting of the chiefs of bureaus in the department, supplemented by others of the more important naval advisors, numbering in all about 14. Apparently among those present were the Secretary of the Navy, the Assistant Secretary, the Chief of Operations, the Paymaster, the Chief of the Bureau of Engineering, and the Judge Advocate General. At this council meeting, the question of carrying out the plans of the Navy was discussed, in which it was virtually agreed that it would be desirable, in perfecting those plans, to have the use of the oil from the naval reserves, inasmuch as the appropriations of Congress were not sufficient to enable the council to carry out its plans. It was suggested that, under the Act of June 4, 1920, oil from these reserves could be secured by exchange directly for the use of the Navy, but doubt was expressed by some members of the council as to the legality of it. The plans above referred to related to the national defense, and had been in existence prior to the advent of Mr. Denby as Secretary of the Navy.

As a result of this conference, it was determined to submit the legal phase of the situation to the Judge Advocate General of the Navy, which was accordingly done by Admiral Robison, bringing in reply a legal opinion, the conclusion of which is in the following language: "It would be legal to exchange the royalty crude oil for fuel oil in storage at Pearl Harbor, or other points to be designated by the Secretary of the Navy, under arrangement whereby the exchanged oil shall be stored in tanks provided by the lessees." Within a few days thereafter the opinion of the Judge Advocate General was

submitted to the Secretary of the Navy, who entered his approval thereon, and, according to the testimony, opposite the paragraph which has been above quoted the Secretary of the Navy made in his own handwriting the following entry: "Do this. E. D. Dec. 5th, 1921."

On December 9, 1921, Assistant Secretary of the Navy Roosevelt addressed a letter to the Secretary of the Interior, inclosing certain plans and specifications of that department covering the storage of fuel oil at Pearl Harbor, Hawaiian Islands, to be carried out with oils secured from the California reserves. In that letter the Assistant Secretary of the Navy requested that, in so far as the war plans of the Navy were concerned, the matters contained in the communication "be regarded as confidential as possible." This letter was replied to by Assistant Secretary Finney, of the Interior Department.

On December 14, 1921, Secretary Denby addressed a letter to the Secretary of the Interior, advising him of the decision of the Judge Advocate of the Navy Department, and expressing the desire that all royalty crude oil should be used in payment of tankage for the Navy and in filling the tankage with fuel oil for storage. The Secretary of the Interior was also advised, as soon as practicable, to make a contract for constructing storage tanks at Pearl Harbor in accordance with plans and specifications formerly forwarded by the Navy Department to the Interior Department. It contains the following clause: "If practicable, I also desire to use the crude royalty oil received during the months of November and December, 1921, as a credit against the construction and filling of the Pearl Harbor storage." The letter also contains a clause advising the Interior Department that Rear Admiral J. K. Robison had been designated as the representative of the Secretary of the Navy "to handle all details in connection with naval petroleum reserve questions." Further, it asked for a monthly summary of the operation of the reserves, as to the progress being made on storage tanks.

On December 31, 1921, Harry F. Sinclair and one Zevely, his attorney, were at the home of Secretary Fall, Three Rivers, N. M., in a conference which, according to the testimony of Zevely, concerned Osage Indian leases, but that inquiry by Sinclair was made of Fall in regard to leasing Teapot Dome. Some time in January, 1922, Mr. Safford, Assistant to Secretary Fall, asked Assistant Secretary Finney, of the Interior Department, to suggest some one who would

be able to prepare a report giving the status of the various mining claims at Teapot Dome. Judge Finney suggested Mr. Tallman, a former special agent of the Land Department.

In the early part of January, 1922, Mr. Safford spoke to one Eddy, an employé of the Department, about such a report, and thereafter Mr. Eddy secured the services of Mr. Tallman, who made a report, underwritten by Mr. Eddy, which shows, among other things, that the mineral claims on Teapot Dome did not deserve serious consideration and that there was no imperative need of opening up Teapot Dome. About January 21, 1922, Dr. Bain and Mr. Ambrose returned from their Western trip.

On January 27, 1922, Secretary Fall returned to Washington, after which return, and within a comparatively short time, a conference was held, attended by Fall, Robison, Bain, and Ambrose. At this conference the matter as to the conditions in the West were discussed, including those surrounding Teapot Dome. Ambrose had met one Tough, who was a mineral supervisor of the Bureau of Mines. At this conference Mr. Ambrose stated that wells were going down in the southern part of Salt Creek, indicating that the boundary line between the north and south sections of the Dome would be affected, which would affect the distribution of oil and water in the territory. Admiral Robison testifies that at this conference Secretary Fall suggested that his information from reports of people in the field led him to the conclusion that these reports were confirmatory of the Wegemann report, suggesting danger of drainage in the Wyoming reserve, and further that Dr. Bain and Mr. Ambrose confirmed that statement. Admiral Robison then suggested that, in view of the California experience, action should be immediate to save a repetition of grave losses.

Immediately thereafter Admiral Robison testifies that he took the matter up with Secretary Denby, in which he recommended the opening for development of the Wyoming reserve as a whole, the insistence upon the necessity of a pipe line for military reasons, and that only complete development of the reserve, as distinguished from a single line of wells, would insure complete protection from drainage from the Salt Creek field. He also testifies that Secretary Denby thereupon agreed, after having demurred somewhat in the first instance, to a complete development of the reserve. Admiral Robison then communicated the decision of the Secretary of the Navy to Secretary Fall, telling him that the Navy would require the building and

filling of fuel oil storage tanks along the Atlantic coast at certain points, of which he gave an approximation as to quantities. He insisted upon a pipe line. He required that they should have the right to exchange crude oil at the wells in Wyoming for quantities of fuel oil in storage. He further testifies that he stated to Secretary Fall that they would undoubtedly have to "deal with some big oil company, other than a Standard Oil interest, because it did not seem there was anyone else who could do it."

Admiral Robison testifies that his motives in making the recommendation were based upon the consideration of national defense and economic necessities. At a later point he summarizes his reasons for his recommendations into three divisions: First, fear of loss by drainage based upon experience in California; second, pressing national emergency regarding our state of security; and, third, securing of better terms by development of the entire Dome, as distinguished from a series of small leases.

Some three or four days thereafter Admiral Robison met Mr. Sinclair in Secretary Fall's office. Robison testifies that Fall told him that he had sent for Sinclair, stating that "Sinclair was a big oil man, and was the kind of man from whom he would like to get a proposal, because he would be able to put it through."

At that time Fall told Robison to set forth to Sinclair in as much detail as possible what was needed. At that time Admiral Robison told Sinclair in the presence of Fall: "That the reserve should be developed as a whole, that a pipe line should be constructed of adequate capacity to care for the production of the field, that the naval proceeds from royalties should be directed towards the erection and filling of specified storage facilities along the Atlantic coast, that the exchange be operated without the use of cash, and that the oil from the wells should be used in exchange for the accomplishment, for naval account, of the facilities to be created."

Thereafter, and on February 3d, Sinclair submitted a proposal for a lease upon Teapot Dome. This proposal was for a contract including, among other things, the following: The right to take out all the oil in the reserve and to pay a reasonable royalty therefor, to be agreed upon, graduated according to the size of the wells, a development of the property as rapidly as conditions and circumstances would permit, the construction of steel storage tanks to take care of the production temporarily, the building of a pipe line, the exchange of royalty oil

for fuel oil, the building of storage tanks along the coast, and the quieting of outstanding claims on the reserve. It also contained the proposer's reasons of the necessity for opening up the reserve, the economy of leasing to one interest, and the advantages to be gained by the construction of storage tanks. On the following day, February 4th, the proposal of Sinclair was submitted to Admiral Robison, who then conferred with Ambrose and Fall in regard to it. During these conferences, the matter of proposals for lease from other companies was discussed.

Then followed, covering a considerable period, negotiations looking to the formulating of plans for a lease with Sinclair. Admiral Robison testifies that he actively participated in these negotiations, being particularly interested in fixing the rates of royalties on oil and gas. Computations along this line were made in the Bureau of Mines, because they had available data concerning production from the adjoining wells in the Salt Creek field. Ambrose, the Petroleum Technologist of the Bureau of Mines, was set to work drafting terms upon the technical matters involved in a proposed lease. Others of the government, who apparently had a part in the drafting of the lease, were Secretary Fall and Eddy, of the General Land Office, who participated in that portion relating to rights of way. Suggestions were secured from Dr. Bain, of the Bureau of Mines. Stanford and Zevely, attorneys for Sinclair, also worked upon the lease. This work was carried on at Zevely's office and at Fall's office. Others were engaged in the checking of the terms of the lease, among them F. W. Lane and one H. B. Hill. Ambrose had been in the department about four years, and had been during that time engaged in the preparation of leases under both Secretaries Payne and Fall. Ambrose does not remember that he was specifically committed to secrecy by Secretary Fall, but understood that all matters concerning the Navy were generally considered as secret. The drafting and redrafting of the lease covered a period of from a month to six weeks, from February 18, 1922, according to the testimony of Ambrose.

On February 18, 1922, Ambrose filed a report in connection with Teapot Dome, which is somewhat technical, but in which his conclusion as to drainage is set forth, that if oil should be found in the saddle in the second Wall creek sand, that drainage would result to a certain southern point, and "if conditions are favorable, the productivity of the sand will be affected even further to the south." During the time that the lease was

in the course of drafting, information in regard to it evidently reached the public, or at least some of those who were interested in oil development.

One James C. Crawford called on Secretary Fall some time in February and made inquiry in regard to the leasing of Teapot Dome. Crawford was a practicing lawyer in the District of Columbia, and Fall at that time told him that he had concluded to offer the Teapot Dome for development, "but that he was not going to offer it publicly, because he did not want to be embarrassed by a lot of irresponsible oil companies and individuals applying to him for a lease." Fall further stated that it would be best to offer it to two or three responsible companies, who would be willing to develop it and undertake the construction of a pipe line involving $15,000,000 or $20,000,000. Crawford and his associates then concluded to affiliate with some of the larger companies and talked with the Texas Company.

On February 28, 1922, Sinclair caused the Mammoth Oil Company, the principal defendant in the case, to be incorporated. During March and the early part of April a number of persons called upon Secretary Fall with reference to leases on Teapot Dome. One of these was Kistler, of the Producers' & Refiners'. Secretary Fall told Kistler at that time that he was not ready to lease Teapot Dome, and would not consider propositions, but would give Kistler another chance. At that time Kistler recommended that a first well be drilled on each structure, and that the remainder of the land should be cut up into quarter sections and sold to the highest bidders. Kistler did not again hear of the matter until he learned that the lease had been granted to the Mammoth Oil Company.

Some time in March one Shaffer called upon Secretary Fall, after hearing that a lease was contemplated to Sinclair; he having theretofore made application for a lease on certain lands in the Teapot Dome. He had formerly inquired about this from Secretary Denby by letter. Shaffer maintained that he had some equitable rights on certain lands in Teapot Dome, in connection with lands which he was developing adjacent thereto in the Salt Creek field. Secretary Fall told Shaffer that a lease was being arranged with Sinclair, and that he had taken up with Sinclair the matter of having Sinclair give Shaffer 200 acres in Teapot Dome. To this Shaffer demurred, on account of the smallness of the acreage, and Fall suggested that he take the matter up with Sinclair direct.

Some time between the 15th of March and April 1, 1922, Gerald Hughes called upon Secretary Fall with reference to the matter of securing a lease upon Teapot Dome. Previous to that time, and in the fall of 1921, Hughes had had correspondence with the Secretary along the same line. At the March conference, Fall told Hughes that he had decided to lease the Dome to Sinclair; the reasons for leasing being that reports of the Bureau of Mines and geologists acting for the government indicated that drainage was taking place, and outlined in a general way the terms of the Sinclair lease. Upon hearing these terms, Hughes concluded that he would not be interested in that kind of a lease, as it would be a much better one than he could consider. Fall told him that the matter was not concluded, as he was in touch with other oil companies or operators, for the purpose of attempting to get still better terms. He mentioned one of the larger companies with whom he was negotiating, but the witness does not distinctly remember the name. Fall further told him that he did not want to lease to the Standard of Indiana or the Midwest Companies, as they already had a monopoly in that field.

Presumably in consequence of the interview between Secretary Fall and Crawford, one Beaty, president of the Texas Company, heard of the proposed leasing of Teapot Dome, and by arrangement called upon Secretary Fall. Beaty subsequently made some tentative proposals, although not in detail, and a dispute apparently arose over a provision in the proposal concerning Bunker A oil. Some telegrams were afterward exchanged. Beaty went to North Carolina, and asked the Secretary to await his return to New York, a week or ten days later, before continuing the negotiations further. The scale of royalties proposed by Beaty was discussed, however, by Fall, Robison, and Dr. Bain, of the Bureau of Mines; their joint conclusion being that, upon the basis of their expectations as to production, the Beaty proposed royalty would not yield as much oil to the government as the Sinclair proposed royalty. In any event, the negotiations with Beaty were not pursued further.

In the interview between Fall and Beaty, it developed that certain mineral claims upon Teapot Dome were discussed, in which it appeared that Sinclair had secured deeds of these claims to the government and filed them with the Secretary of the Interior, to become effective upon the contingency of his securing the lease. In regard to them Beaty testifies: "I had heard something about those

claims, and had the impression that they had not been delivered irrevocably, but that, if my company should obtain a lease, it could acquire these claims, and I stated that to the Secretary." These parties also discussed the exchange of Salt Creek royalty oil for fuel oil.

The disputed mining claims located upon Teapot Dome seem to have been held by organizations commonly spoken of as the Pioneer and Belgo Companies. These claims, or a portion of them, had several times been before the Department of the Interior, and had been denied, but applications for rehearings of some character were still before the department. One of the conditions to go with a lease upon Teapot Dome was a requirement from the lessee to negotiate a settlement of these claims. This it appears Sinclair did, for a consideration paid and to be paid, approximating $1,000,000, conditioned, as heretofore stated, upon his securing the lease.

There is some evidence that Secretary Fall had talked with others about a lease on the Dome, although it does not appear that others than those mentioned have testified to such conversations. Mr. Beaty testifies that it was generally known among oil companies that a lease was under consideration, and that in his connection with the transaction he saw no indication of secrecy. The lease itself was signed on April 7, 1922, in the presence of Mr. Ambrose. The lease was then transmitted to the Navy Department and the matter was retained in that department and considered by the Secretary of the Navy and Admiral Robison for about a week, being signed by the Secretary of the Navy on April 12th. The rough draft of the lease had been previously considered in detail by Secretary Denby and Admiral Robison, going over the terms section by section.

The lease itself is an exceedingly long and technical instrument, containing many features not material to the consideration of the issues here involved, but nevertheless requiring at least a summarized analysis of its provisions. The preamble recites the duty of securing and storing fuel oil for naval purposes and the desirability of securing that storage at accessible points; the desire of the government to avoid the risk of loss of oil in naval reserve No. 3 on account of reduction of gas pressure, because of operating in adjacent territory; the desire of the government to create a competitive market for its royalty oil received from the Salt Creek field; and the desire to exchange crude oil for fuel oil for the use of the navy, and the securing of adequate storage facilities for such fuel oil.

A description of the property, consisting of 9,321 acres, is then set forth. A bond of $250,000 is required of the lessee to insure a compliance with the terms of the lease. A drilling requirement is made to begin within a period of 180 days, specifying the place at which the first well shall be drilled, and that tests shall be made from time to time. It further provides that, when the wells shall reach or exceed a capacity of 20,000 barrels per day, a pipe line shall be constructed by the lessee, extending from the field to a connection with a line of the Prairie Pipe Line Company to Chicago, Ill. Second and third series of wells are required to be drilled under certain conditions. Wells to offset the wells of others on adjoining lands are required. Royalties are provided on gas, casing-head gas, casing-head gasoline, and oil to be produced. These royalties range on gas from $12\frac{1}{2}$ to $16\frac{2}{3}$ per cent., on casing-head gasoline they are $16\frac{2}{3}$ per cent., and on oil, depending upon the quality and daily production per well, they range from $12\frac{1}{2}$ per cent. to 50 per cent. The contract further provides that the lessor shall sell to the lessee the royalty oil produced at a price to be controlled by the market, which shall be the highest in any one of three specified oil-purchasing areas, and that certificates shall be delivered by the lessee to the lessor, which may be, at the option of the latter, used in four different ways: (a) In exchange for the construction by the lessee of steel storage tanks in carrying out the plan of exchanging crude oil for fuel oil; (b) in exchange for fuel oil; (c) in exchange for gasoline, kerosene, lubricating oils, and other petroleum products required by the Navy; and (d) redeemed in cash. Detail is set forth as to how these exchanges shall be carried out, and reference is made to future contracts to specify in more detail the manner of the exchange. It is also provided as to what points, at the option of the government, fuel oil may be delivered. The quality of fuel oil is prescribed. Provision is made for making reports of drilling operations, logs of wells, and the like, and in regard to payment of taxes and wages of employés of the lessee. Methods for conducting operations and for computing royalties are set up. Rights of way, easements, and surface rights are covered, as well as matters concerning the termination of the lease and proceedings in case of default.

Inquiries in regard to the leasing of the Dome began to multiply, not only coming

from those who were prospective lessees, but from those having a public interest. On April 12, 1922, Secretary Fall, in answer to a letter of April 6th, wrote to Senator La Follette, in which he reviewed what the Navy and Interior Departments had been doing in regard to naval reserves—that is, as to general plans for the leasing of the reserves.

On April 13, 1922, Secretary Fall left for his ranch at Three Rivers, N. M., and before leaving told Judge Finney, Assistant Secretary, that the Wyoming naval reserve lease had been signed and was locked in his desk, to which Mr. Safford, his assistant, had the key, but that he did not care to have the matter get out until the lease for the building of tanks at Pearl Harbor had been consummated, and that the Navy desired to keep the location of the tanks in secrecy. This secrecy, according to Admiral Robison, had been requested of the Secretary of the Interior as to the military portion of the contracts. Before leaving Washington, Secretary Fall addressed a letter to Senator La Follette, stating that the details as to handling naval oils would not be given out unless permission should be given by the President. On April 18, 1922, a publicity statement was given the press regarding the lease to Sinclair of the Wyoming reserve, as well as the decision to award a contract to the Pan-American Petroleum Company upon the California reserves.

On April 21, 1922, a letter was addressed by Secretary Denby and Assistant Secretary Finney to the President of the Senate, in response to a resolution for full information in regard to leases for naval reserves. Some time on or about April 26th copies of the lease itself were available.

Some time in December, 1922, the Mammoth Oil Company submitted its bid for the purchase of royalty oil from the government's leases in the Salt Creek field, and represented to the Secretary of the Interior that, if its bid was accepted, construction of the pipe line called for in the lease would be started immediately, irrespective of the fact that the Teapot Dome structure would not yield a production of 20,000 barrels, as specified by the lease. Shortly thereafter, the Mammoth bid being the highest and best, that company was advised that the bid would be accepted, provided the bidder would agree, at the option of the United States, to exchange a barrel of fuel oil for each barrel of royalty oil so purchased, and a purchase contract was thereafter consummated. On or about December 20, 1922, the Sinclair Pipe Line Company, the nominee of the Mammoth Company, entered into a contract for the construction of the pipe line mentioned in the lease of April 7, 1922, which pipe line was subsequently constructed at an expense of approximately $21,000,000.

On January 26, 1923, Secretary of the Navy Denby addressed a letter to the Secretary of the Interior, giving certain specifications as to the storage of fuel oil, gasoline, and lubricating oils, and requesting the Secretary of the Interior to call upon the Mammoth Oil Company to enter into a supplemental contract, referred to in the contract of April 7, 1922, covering these matters. A supplemental contract was subsequently drawn up, which provided for the construction, at cost plus percentage overhead, of storage tanks at specified points, the exchange of oils, and the like, which was submitted to and gone over by Secretary Denby and Admiral Robison, and subsequently signed and became the contract known as that of February 9, 1923; this contract bearing both the signatures of Secretaries Denby of the Navy and Fall of the Interior, like the former lease agreement. Under this contract, the construction of storage facilities was to be undertaken at Portsmouth, N. H., Melville, R. I., Governor's Island, Boston Harbor, and Yorktown, Va., and construction had proceeded to a point at Portsmouth that about $1,000,000 had been expended at the time this litigation ensued.

Two collateral transactions are relied upon by the plaintiff in respect of its contention of conspiracy set forth in its bill. In November, 1921, one Henry M. Blackmer, at that time president of the Midwest Refining Company, made a contract with one A. E. Humphreys, president of oil companies doing business in the state of Texas, for the purchase of 33,000,000 barrels of oil at the agreed price of $1.50 per barrel. Humphreys telegraphed his attorney, Senator Thomas, of Denver, to come to New York, advising that he had made a sale of the oil to Blackmer at $1.50 per barrel. There was then a meeting in New York, at which there were present Humphreys, Thomas, Blackmer, Sinclair, O'Neil, president of the Prairie Oil & Gas Company, and Stuart, an officer of the Sinclair Crude Oil Purchasing Company, a company apparently jointly owned by the Sinclair interests and the Standard interests.

The terms of a contract was agreed upon for the sale of this oil, and Mr. Blackmer requested that the Continental Trading Company, a Canadian corporation, be named in the contract as the purchaser. To this suggestion Col. Humphreys made some objec-

tion, upon the ground that he was not familiar with the financial responsibility of this company, and was then informed by O'Neil, Stuart, and Sinclair that, as their companies had made a deal for the purchase of the oil involved, they would guarantee the Humphreys contract. After the contract was prepared and ready for signature, one H. F. Osler was by Blackmer introduced as the president of the Continental Trading Company, who executed the contract in its behalf.

Two other contracts were at the same time made between Humphreys and the Sinclair and Prairie Companies, one covering 50 per cent. of the production of Humphreys' companies over and above the 33,000,000 barrels covered by the Continental Trading Company contract at market, and the other a contract between the Continental Trading Company and the Prairie and Sinclair Companies, purchasing upon the basis of $1.75 per barrel the oil covered by the contract between Humphreys and the Continental. A guaranty contract by the Sinclair and Prairie Companies of the Continental contract was also executed.

As to the presence of Sinclair, Stuart, and O'Neil, Senator Thomas testified that he assumed that they were representing the Sinclair Crude Oil Purchasing Company and the Prairie Oil & Gas Company, which entered into the contracts for the purchase of oil. The oil produced under the Humphreys contract, and repurchased by the Sinclair Crude and Prairie Companies, yielded a profit which Osler, as president of the Continental Trading Company, invested in government bonds. These bonds, on request of Osler of a bank in New York City, were purchased at various brokerage houses.

The Continental Trading Company had been organized under the laws of Canada, and, as is permitted by that government, only shares of stock sufficient to constitute the corporation were issued, but holding warrants without name were issued and distributed to those having property interests in it. The deposition of Osler was taken upon a commission issued out of this court, but which ended by the plaintiff not being able to secure answers in full to questions propounded to the witness (the witness principally refusing to disclose the name of his client for whom he organized the Trading Company, upon the ground that it was a privileged communication between attorney and client). The matter was taken upon appeal to intermediate and higher courts of Canada, and no decision upon the legal questions involved in the witness refusing to answer was secured, so as to make any additional testimony available at the trial, although several continuances were granted for that purpose. So far as this court knows, the matter is still pending before the Canadian courts.

The testimony which Osler did volunteer to give was to the effect that he had no recollection of meeting Sinclair in New York upon the occasion of his visit there to complete the contracts, and further that he had no recollection of having distributed the holding warrants, and therefore to the best of his knowledge had no information of the actual persons who were the owners of share warrants issued by the Continental Trading Company. Osler's testimony is of an uncertain character, evidently very carefully guarded and unsatisfactory, so far as giving positive information is concerned.

A portion of the government bonds which were purchased by the Continental Trading Company, according to the trend of testimony admitted over the objection of defendants, and ruling upon which was reserved, later appeared in the hands of one Everhart, a son-in-law and partner of Secretary Fall in the state of Texas, and were partially used by Everhart in retiring some indebtedness of the company in which he and Fall were jointly interested, and partially deposited to the credit of Fall individually. Everhart was called as a witness by the plaintiff, and refused to testify, upon the ground that his answer would tend to incriminate him; but, his reasons not appearing to the court sufficient, his claim to exemption was denied. He then made an additional statement of reasons sustaining his position, which the court did recognize as sufficient, so that he did not testify. Attempt was made to take depositions of Blackmer and O'Neil, who were then in France, and who apparently refused to testify. Stuart was not presented as a witness in the case.

The other collateral transaction relied upon by plaintiff involves the matter of a transfer of $25,000 in government bonds by Sinclair to Fall. These bonds were shipped by express by the employés of Sinclair to the First National Bank of El Paso, Tex., with a letter of transmission stating that they were the property of Fall, and asking the bank to receive them for his account. This was in June, 1923. Fall also wrote the bank at about the same time, instructing them to credit these bonds to his account, authorizing a charge to be made against it, and stating that he was leaving for Europe on busi-

ness. The bonds were received and used in the manner directed. The transaction is explained, that after the retirement of Fall from the employment of the government he was sought by Sinclair to go with him to Russia upon business concerning the securing of contemplated oil leases in Russia; that Fall indicated that he would go, provided he secured the approval of the administration at Washington, but that he would need some money to close up some deals he had on hand before leaving, and that he would follow Sinclair to Russia at a later date. Fall went to Russia, and upon his return gave Zevely, Sinclair's attorney, his note for the $25,000, representing the value of the bonds transferred, which note, when the matter was under investigation, had not been paid, and no considerable portion of the money had been used by Fall before, or at least for some time after, he returned from Russia.

### The Legal Questions.

In beginning an analysis of the intricate legal problems involved in this case, the court has been impressed with two unusual situations not ordinarily found in cases of this character: First, although a conspiracy is one of the bases for the annulment of the lease, one alone of the many government officials having taken an active part in its consummation is charged with corrupt and ulterior motives. We take it, from the evidence and the expressed views of plaintiff's counsel, that although Denby, Roosevelt, Robison, Finney, Bain, Ambrose, and Eddy had more or less of an intimate knowledge of the entire transaction, and some of them, at least, an active and persuasive influence in bringing it about, they must be considered as absolved from any incriminating fault as to fraudulent motive. Counsel for the government in argument, being asked as to the basis of Admiral Robison's assertive attitude, charged it to superenthusiasm and zeal for the welfare of that defense arm of the government which he represented. Second, there is the significant lack of material damage to the government which usually attends allegations of fraud, for in the case at bar no attempt has been made to show that the lease in controversy was in itself a bad lease for the government, except perhaps theoretically by counsel; but, on the other hand, the testimony of the plaintiff's own witnesses, who are competent to speak upon the subject, tends to show that it is a lease much more favorable to the government than they, as oil operators, would be willing to assume.

These elements are perhaps not controlling in a case of this character, but they are at least worthy of mention, as being conspicuous, because their presence is usually the basis of relief sought in cases of this kind. There are so many legal questions presented and discussed that it is difficult to select a logical order for their presentation. However, the following order may be as convenient as any other:

(a) The Attack upon the Bill.
(b) The Executive Order.
(c) The Charge of Fraud.
(d) The Legality of the Lease.
(e) The Policy of the Government.
(f) The Motion to Strike.

### (a) The Attack upon the Bill.

[1, 2] Counsel for defendants have in a measure challenged the bill as to the allegations of the conspiracy to the effect that, in the absence of any showing of fraud in the proofs as to the Mammoth Oil Company being a party to the conspiracy, the proofs of it among those specifically charged will not necessarily sustain the action; the legal basis of such an action being in reality a tort committed from which damages will logically flow. The idea is expressed in the case of James v. Evans, 149 F. 136, at page 140, 80 C. C. A. 240, 244, in the following language: "This is in substance an action on the case in the nature of conspiracy. Being a civil remedy, the gist of the action is not the conspiracy charged, but the tort working damage to the plaintiff."

In answering this contention, counsel for plaintiff rely upon equity rule 19, to the effect that the court must disregard errors and defects which do not affect the substantial rights of the parties, and upon a number of federal cases requiring liberal construction of pleadings, among them being Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, and United States v. United Shoe Machinery Co. (D. C.) 234 F. 127.

While the allegations of conspiracy do seem to be emphasized more particularly in the bill than do the averments of specific fraudulent acts, yet this court is inclined to the view that such latter acts are sufficiently alleged to fully apprise the defendants of the charges to be met, so as to entitle the plaintiff to a decision upon the merits. We are further of the opinion that the evidence in the case discloses that the defendant Mammoth Oil Company was the creature of Sinclair to such an extent that it must be held

responsible and liable for all his acts in and about the transactions involved.

### (b) The Executive Order.

While the invalidity of the executive order of May 31, 1921, is alleged in the bill, as being void in law and brought about by Secretary Fall for the purpose of enabling him to carry out the plans under the alleged conspiracy, we assume that this matter may as well be disposed of 'first, because of the fact that it has been very largely eliminated from the case, for the following reasons:

First, in the opening argument, counsel for the government used the following language: "The executive order was issued May 31, 1921. We have certain averments in this petition or bill which were in accordance with what information we had at that time. Frankness compels the statement that our evidence, so far as that is concerned, is limited to the fact that the Secretary of the Interior and the Secretary of the Navy prepared this executive order and presented it, and presumably it must follow that, having presented it, they presented it, that it was for the proper purpose, and that the President of the United States had the authority to execute such an order." This statement would seem to amount to an abandonment of the claim of any irregularity or fraud surrounding the transaction on account of the executive order.

[3] Second, the evidence clearly shows that the negotiations preceding the execution of the lease were actively, earnestly, and completely participated in, if not dominated, by the Secretary of the Navy and his designated representative of that department, Admiral Robison. Denby gave specific instructions in his own handwriting and over his own initials as to what the proposed lease should contain, and Robison outlined and insisted upon the principal provisions of the lease which are here challenged. Admitting that Fall wrote to Doheny that he would have no further conflict with naval officials, and that he would conduct all future matters concerning naval leases under direction of the President, and would confer in regard thereto only with the Secretary of the Navy personally, the statement was made in regard to an entirely separate and distinct transaction, not involved here, and the fact remains that, with respect to the lease in controversy, not a single significant act was performed without the advice and consent of Robison, the designated personal representative of the Secretary of the Navy, who testifies that he consulted continuously with his chief in regard to every proposed move and plan, which evidence is not disputed, although Secretary Denby was presumably available as a witness, had plaintiff's counsel desired to call him for the purpose of disproving Robison's statement. The lease was executed by the Secretary of the Navy, after full and mature consideration and review of its contents, which must lead to the conclusion that the lease was his legitimate child, brought to life in the exercise of his official discretion. If this suit involved an attempt to fasten the responsibility for the lease upon the Secretary of the Navy, where in the nature of things it logically belongs, the evidence would clearly place it there. Therefore we should not become confused, in the consideration of the companion proposition here raised, in trying to shift it, through any form of argumentative juggling of legal principles upon this point.

Admitting for the sake of argument, that Fall suggested full development of the reserve by lease, and the exchange of oil for fuel oil in storage, and Denby adopted the suggestion and executed the lease after mature consideration, as the evidence shows he did, to hold that it was not Denby's official act is, it seems to us, little short of branding him as an imbecile. In so far as the allegation that the lease was made under the authority of the executive order is concerned, the negotiations and manner of executing the lease show them to have been such that it was immaterial whether the order had ever been made or not. Nothing appears which would seem to make it unlawful for one department to counsel with and receive advice from another department of the government, and it may be assumed as practical sometimes to use the machinery of other departments in carrying out plans, so long as the executive administration and policies are retained in and directed by the department head, where by congressional authority the discretion is vested. In this respect it seems at least natural that the Navy Department, when desiring experienced and responsible operators upon a large scale, should have thought of the probable information possessed by the Interior Department, in touch with hundreds of operators, large and small, through its administration of the General Leasing Act.

Third, in their brief, counsel for plaintiff virtually abandon any discussion of the invalidity of the executive order, and refer only to a purported delegation of authority by the Secretary of the Navy to the Secretary of the Interior, relating to the power to fix

the price of gasoline, determine tests of oil lands, the surrender and termination of the lease, and the right to permit assignments or subleases as fixed by the lease, which is an attack upon the validity of the lease itself, and not under any power vouchsafed by the executive order. In the final argument of counsel for the government, it is not contended that any finding that these latter elements were in the nature of an attempt to transfer discretion, and therefore violative of the law, would render the lease invalid; the language of counsel in reference to the attack upon these above-mentioned matters being: "I must be frank with your honor. Those provisions, in my judgment, would be severable. In other words, if these were the only illegal provisions of the lease, take them down, if you find them illegal, and strike them out, and let the rest stand."

So that, until the Interior Department were seeking to exercise affirmative authority in the manner and upon the things purported to be delegated to it in the lease, no complaint could arise. This eliminates from further consideration the alleged invalidity of the executive order as a basis for relief.

### (c) The Charge of Fraud.

[4] Starting with the assumed proposition that the bill contains allegations of fraudulent acts which in their nature constitute a tort justifying the relief sought, eliminating allegations of irregularity and invalidity in connection with the executive order which has heretofore been disposed of, and reserving for future consideration the validity of the lease itself under the Act of June 4, 1920, the charges of fraudulent acts may be generally summarized as follows: The secrecy with which Secretary Fall surrounded the entire transaction; the denying of others an opportunity to bid, and discouraging them from bidding; the refusal of Fall to seek counsel in regard to the legality of the lease from the Solicitor of the Department of the Interior or the Attorney General; the act of Fall in making the obtaining of quitclaim deeds of outstanding claims upon the lands a condition precedent to granting a lease, with intent to stifle competition; the alleged agreement between Fall and Sinclair to the setting apart of a portion of the lands to be leased for the benefit of Shaffer and as a condition precedent to granting a lease upon the premises; and the defrauding of the United States by granting a lease to the defendant at an inadequate, improper, and fraudulent consideration. The proofs offered by plaintiff, to be considered in support of these charges, naturally divide themselves into two classes: First, the facts relating to and surrounding the agreements themselves; and, second, the collateral transactions tending to support the charge of fraud.

As to the charge of secrecy, it must be admitted as proven, if not making public every official act, or not consulting with the departments of government, other than those immediately concerned, or Congress, be proof of unusual secrecy in the premises. There is no substantial evidence of the negotiations and transactions leading up to the lease being kept from the leading members of the official families of the Secretary of the Interior and the Secretary of the Navy, as the evidence clearly shows that those divisional heads who would in the nature of things have knowledge of the transactions which were taking place had such knowledge. As, for example, excluding Fall, Denby, and Robison, who were personally directing the plans and negotiations, we find the entire board known as the Council of the Secretary of the Navy, consisting of approximately 14 men, discussing the plan which was eventually adopted. The Judge Advocate General of the Navy was consulted in regard to the matter, and rendered a legal opinion thereon. Judge Finney, First Assistant Secretary of the Interior Department, was in a general way familiar with the negotiations preceding the lease, although not in direct charge, because, as he testifies, he was working on the California leases when Secretary Fall was working upon the Teapot Dome lease. Dr. Bain the Chief of the Bureau of Mines, and certainly the head of a department which would in preference to all others be consulted upon the technical features of a plan of this character, was in constant touch with the situation and fully consulted. Mr. Ambrose, Chief Petroleum Technologist of that bureau, who, if title means anything, would be a man naturally relied upon for advice, was likewise a moving spirit in the transaction. Bain and Ambrose made trips to the Wyoming field and consulted with leading geologists of the West in regard to conditions in Teapot Dome. Wegemann, a gentleman formerly connected with the bureau, but then in private practice as a petroleum geologist, and a man of wide experience in Western oil fields, was consulted. Safford, Eddy, Tallman and others connected with the Interior Department all knew of the development of plans for the leasing of Teapot Dome. The fact that neither Secretary Fall nor Secretary Denby consulted Congress in regard to their plans for opening up Teapot

Dome is not significant, if it may be fairly held that they conceived their right to do the things they purported to do under the Act of June 4, 1920, for the reason that Congress had already officially spoken upon the subject.

A little strength may be given to the theory of secrecy on account of the national defense. We glean from the evidence that at least some of those connected with the Navy Department, including Roosevelt and Admiral Robison, felt that a reasonable degree of secrecy should be maintained. Whatever part Admiral Robison played in the plan of secrecy, however, cannot be charged to any conspiracy to defraud the government, as the severest charge against him is that of being overzealous for the success of the plan proposed, and feeling that, if it were broadcasted, Congress, regardless of the Act of June 4, 1920, might raise some objection. The most suspicious secretive act surrounding the transaction, at least so regarded by counsel for plaintiff, appears to be the act of Secretary Fall in locking the lease in his desk upon leaving Washington on April 13, 1922, with instructions that the information should not be given out in regard to it just at that time, although the key to the desk was left with Safford, the Assistant to the Secretary. Judge Finney, First Assistant Secretary, plaintiff's witness, was advised of this, and testifies that Secretary Fall gave as a reason at the time that he did not desire to have it given out until the California leases were signed, and they could then be announced together as one achievement. In any event, the lease then having been signed, no particular advantage could be gained in consummating any conspiracy or fraudulent act by then maintaining secrecy, as the desired end had already been accomplished, whether legal or illegal, and no move was made by the government to avoid the lease until some two years later. In this view, Fall's reason at least appears to be logical.

As to the matter of secrecy with those making inquiry, the evidence, when analyzed, virtually amounts to a common business method of Fall talking with those only whom he and Robison thought would be financially able to carry out a plan, such as the Navy Department and his own department had in mind, which included an opening up of the entire Dome and the building of a pipe line. Kistler's idea was plainly partial leasing and sale of leases in small tracts. It must be admitted that Fall talked with Gerald Hughes, of Denver, and told him of the general plan of the lease with Sinclair and of the cove-nants which he expected to exact. Fall did enter into negotiations with Beaty, of the Texas Company, and proposals by him were considered before the execution of the Mammoth lease. Robison and Bain concluded the Sinclair royalties were better than those of Beaty. Fall stated to Crawford and others, in regard to the leasing of Teapot Dome, that he was not going to offer it publicly, for the reason that he was not going to be bothered by a lot of irresponsible companies and individuals applying for a lease. The information concerning the contemplated leasing of Teapot Dome had reached as far west as Denver a considerable time before the lease was granted, which in fact, according to the testimony, inspired some of the inquiries which were made in regard to it.

[5] As to the charge that Secretary Fall refused to seek the advice of the Solicitor in his own department or the Attorney General of the United States, only one suggestion need be made. While the Secretary of the Interior is criticized in the bill for engineering the entire plan for leasing the Wyoming reserve, and with negotiating the lease and consummating it independent of the Navy Department, and with only the "colorable attempt" on the part of the Secretary of the Navy to exercise his discretion, yet the evidence shows that, when legal advice was thought necessary in regard to the legality of a proposed lease then under advisement, such advice was sought and received from the head of the legal staff in the Navy Department. Under these circumstances, the criticism could scarcely reach further than an alleged error of judgment in the choice of lawyers.

As to the charge that others were denied an opportunity to bid, and discouraged from bidding for the lease, the evidence, fairly analyzed, tends to disclose that negotiations were conducted with others of a certain class looking to the matter of a lease; as, for example, negotiations were actively pursued with the Texas Company, one of the larger companies engaged in oil production. The testimony is that inquiries were also made of some of the other larger companies without bringing any results. It is admitted that no negotiations were opened with the Standard interests, because of the announced policy that those interests dominated the oil industry in the vicinity of the lands here in controversy, and that a lease to them would stifle competition in the sale of the government's Salt Creek royalties. It is fairly inferable that many of the other organizations and individuals making inquiry in regard to

a lease were in the class which Fall designated as "irresponsible"; that is, in so far as being financially able to handle a project of the magnitude here contemplated. As to the Sinclair interests being "Maggie in another dress," referred to in the evidence and briefs of counsel for plaintiff, it is fairly safe to assume that all oil-operating interests are "Maggies" at times, when their business and economic needs seem to require it. Furthermore, if it be admitted, as the court understands it to be in this case, that the lease itself might have been lawfully granted by the Secretary of the Navy without competitive bidding, and it is nowhere required in the Act of June 4, 1920, nor is it within the scope of any other law, it is difficult to figure out why there should be a criticism of not seeking competition, unless it be coupled with a showing that the lease actually granted was a poor one, so far as the plaintiff is concerned, or would have been improved by the use of advertisement for competitive bids.

As to the charge that the requirement of securing quitclaim deeds of former mineral claims upon Teapot Dome as a condition precedent to the granting of a lease, the evidence discloses that these claims in some form were still pending before the department upon rehearing, although they had previously been denied, but there was at least, according to the testimony, a difference of view among some people as to their legality. Reports had been filed by geologists, which were introduced in evidence, denying their validity; but this can scarcely be considered as conclusive substantive legal proof, nor was it judicial or departmental adjudication. Furthermore, the general plan of settling at one time all the pending litigation concerning the rights of the government in and to the lands contained within the structure, shorn of all other circumstances, would seem to be at least a very practicable way of once and for all eliminating these more or less disturbing elements. A similar situation had before developed in the California reserves, and compromise was made by the government with parties who were making claims. Certainly no particular blame could be laid at the door of these claimants, if they believed they had valid claims, for exhausting every effort to secure the recognition of them.

In this category may be placed the Shaffer claim. It is possible that Fall believed that Shaffer had some particular right which should be recognized, and for that reason interceded with the prospective lessee in his behalf. In any event, it is not apparent that Shaffer was to any extent an applicant for a lease upon the entire structure, but only as to a certain acreage adjacent to that which he was developing on the outside, so that he was in no sense a competitor for the kind of a lease contemplated. Presumably, of course, in meeting the conditions imposed upon the prospective lessee, Sinclair would have to pay some consideration to rid the situation of this impending source of litigation, which undoubtedly the departments desired to avoid without additional expense to the government.

While there are no specific allegations in the bill concerning the so-called "collateral" transactions, it can be taken that they reasonably come within that charge of the bill that the United States was defrauded by the granting of a lease for an improper and fraudulent consideration. The first of these transactions may be designated as the Continental Trading Company transaction. A synopsis of this has been outlined in the previous statement of facts herein. Counsel for the plaintiff would have the court draw the inference that, because one of the Sinclair companies other than the Mammoth Oil Company was the purchaser of certain oils theretofore contracted for by Blackmer from Humphreys, in which purchase other oil companies were likewise interested, Sinclair is presumably guilty of fraud, because some of the bonds, which had been purchased by the company which Blackmer had nominated as his agency for consummating his contract, were found in the possession of Fall's relative. No connecting link, other than the fact that one of the Sinclair companies was, with another company, the purchasers of this oil, together with additional oils from Humphreys under an independent contract, and the presence of Sinclair in consummating the contracts, is offered upon which to predicate such inference and assumption, which counsel ask the court to grace with the solemnity of a judicial finding of fact.

In the first place, we have been unable to find anything in the evidence, and counsel offer nothing in the briefs, upon which to predicate a finding that Fall and Sinclair were in personal contact before December 31, 1921, at Fall's ranch in New Mexico, although it is possible that the name of Sinclair, among others, might have been mentioned in the conferences between the officials of the Navy and Interior Departments before that time as one of the men who would be financially able to take over and carry out a lease such as was contemplated. The Continental Trading Company deal with Humphreys occurred more than a month prior,

which strongly tends to negative the supposition of a conspiracy between the two, as well as lacking a substantial element in the establishment of fraud. Again, while the apparent basis of the refusal of Osler to answer in the Canadian deposition was that he would not reveal the name of his client who employed him to organize the Continental Trading Company, and which counsel for the plaintiff sought to have him directed by the court to answer, the evidence in this case discloses quite plainly that his client was Blackmer, and not Sinclair. The original view of the court, when applications for continuances were granted for the purpose of securing the Osler testimony, was that it would disclose that Sinclair was the client under whose direction and employment Osler had organized the Continental Trading Company, and we believe that counsel for plaintiff themselves originally participated in this belief. However, the testimony of Humphreys and Thomas clearly disclose that Osler and the Continental Trading Company were the creatures of Blackmer, which leaves us in the transaction with no other connection between Sinclair and Fall, except by mere suspicion or guess, and even this at a time considerably in advance of any established contact between them.

Again, in order to reach the conclusion recommended, it must be assumed that the double purchase and sale oil transaction was a "faked-up" transaction, instead of one in the regular course of business, and that the officials of the participating companies, from the Humphreys to the Sinclair Crude Oil and Prairie Oil & Gas, were knowingly participating in the "fake," which is equivalent to a charge of assisting in the bribing of a federal officer, and that in the consummation of a transaction in which they are not shown to have had any interest. Upon the evidence here there is an easier way out, which is to assume that the transaction was bona fide.

It is at least quite plausible to assume that the Continental Trading Company transaction was a legitimate one, and carried on in the regular course of business. Blackmer, who was not associated in any way with the Sinclair companies, so far as the evidence shows, negotiated a purchase of oils from Humphreys, and a sale of the same oils to third parties who were large oil-purchasing companies on the market. On the face of the transaction, at least, he acted as a broker. As to why he designated a company, instead of himself, to become the intervening party, is not disclosed, nor do we know that it is material, inasmuch as it is not shown

that Sinclair was interested in the company, or that any other connection between Fall and Sinclair was disclosed in regard to it. Blackmer may have had people other than either one of these interested with him in his deal, and for that reason may have found it necessary and convenient to have organized a company. Being an officer of the Midwest Refining Company, he may not have desired to testify in regard to the details of the transaction, for the reason that it might be thought by his company that he should be held accountable for the profits derived in his brokerage transactions, or he may have been desirous of avoiding income taxes, or his refusal may have been based upon the ground that, as there was no connection between his transaction and the Mammoth lease, it was not the concern of other people in their investigation of an entirely different and disconnected transaction. In the realm of speculation, we may allow our imaginations to roam at will. Stuart and O'Neil did not testify, although it appears that Stuart might have been available.

In applying the rules which must govern the court in a case of this nature, the attention of the court is directed to certain established principles of law. In the case of United States v. Stinson, 197 U. S. 200, at page 204, 25 S. Ct. 426 (49 L. Ed. 724), the court says:

"While the government, like an individual, may maintain any appropriate action to set aside its grants and recover property of which it has been defrauded, and while laches or limitation do not of themselves constitute a distinct defense as against it, yet certain propositions in respect to such an action must have been fully established:

"First. The respect due to a patent; the presumption that all the preceding steps required by law have been observed before its issue; the immense importance and necessity of the stability of titles depending upon these official instruments demand that suits to set aside or annul them should be sustained only when the allegations on which this is attempted are clearly stated and fully sustained by proof. Maxwell Land Grant Case, 121 U. S. 325; Colorado Coal Company v. United States, 123 U. S. 307; United States v. San Jacinto Tin Company, 125 U. S. 273; United States v. Des Moines, etc., Company, 142 U. S. 510; United States v. Budd, 144 U. S. 154; United States v. American Bell Telephone Company, 167 U. S. 224.

"Second. The government is subjected to the same rules respecting the burden of proof, the quantity and character of evidence,

the presumptions of law and fact, that attend the prosecution of a like action by an individual. 'It should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful.' Maxwell Land Grant Case, supra, p. 381; United States v. Iron Silver Mining Co., 128 U. S. 673, 677; United States v. Des Moines, etc., Company, supra, p. 541."

[6, 7] Thus we are confronted with the fundamental principle, first, that a grant of the government is entitled to due respect, and to be clothed with the presumption that the preceding steps required by law have been observed, and that this is necessary to insure stability to titles depending upon official instruments; and the second principle is that the plaintiff in this case, because it is the government, is entitled to no greater consideration than a private litigant.

[8] Another fundamental principle is that allegations of fraud must be established by clear, unequivocal, and convincing proof. This is clearly stated in the United States v. Maxwell Land Grant Case, 121 U. S. 325–381, 7 S. Ct. 1015, 1029 (30 L. Ed. 949) in the following language:

"We take the general doctrine to be that, when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence, which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them, should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof."

[9] Still another rule is that, where two constructions may be placed upon an act, that construction which will make it legitimate and honest will be preferred. This

principle is enunciated by our own circuit in the case of Foster v. McAlester, 114 F. 145, in which, at page 152, 52 C. C. A. 107, 114, the following language is used:

"Many innocent and lawful or indifferent acts are linked together, apparently on the assumption that their aggregation would impart to them an odious quality, which separately they did not possess. But the law will not deduce fraud from any number of lawful and innocent acts. One who seeks to attach a fraudulent character to such acts must go further, and show they were in fact done with a fraudulent intent and for a fraudulent purpose."

The books are replete with authorities sustaining these principles, but the pre-eminence of the courts in the cases cited would not seem to justify further citation of authority.

[10] The contention of counsel for the plaintiff, as this court understands it, is that the court should draw inferences of fraud from Sinclair's failure to testify. This is virtually an admission that there is a missing link in the way of evidence surrounding the Continental transaction, in that there is failure to connect up Fall with Sinclair in the transaction. They rely, however, upon that well-known principle of law that, where a litigant has certain substantive facts within his knowledge and refuses to reveal them, there is raised against him a presumption that those facts, if revealed, would be against him. This is a well-recognized principle of law, and is supported by the authorities cited by plaintiff, among others being Bilokumsky v. Tod, 263 U. S. 149, 44 S. Ct. 54, 68 L. Ed. 221, and Missouri, K. & T. Railway v. Elliott, 102 F. 96, 42 C. C. A. 188, a case in our own circuit.

We take it, however, that this rule goes no further than to raise a presumption against the litigant, where the facts sought to be inferred are laid at the door of the litigant, or placed by the evidence as being clearly within his knowledge, that they have not been revealed by other witnesses, and that sufficient proof has been introduced to sustain a prima facie case upon the bill without the indulgence of the inference. This principle is sustained by a number of authorities. Corbin & Co. v. United States, 181 F. 296, 104 C. C. A. 278; Diel v. Missouri Pac. Ry. Co., 37 Mo. App. 454; Loper v. Askin, 178 App. Div. 163, 164 N. Y. S. 1036; Omar Oil & Gas Co. v. Bair Oil Co. (D. C.) 285 F. 588.

[11] The trouble with the application of the principle contended for by counsel for plaintiff in this case is that no facts, the

proof of which we are asked to deduce by inference, are laid at the door of Sinclair. The entire transaction, in so far as it was participated in by Sinclair, was fully revealed by other witnesses, and presumably, if we are to presume anything on account of the failure of Sinclair to testify, if he elected to so testify, his testimony would have been to the effect that he knew nothing further in regard to the Continental Trading Company transaction than was disclosed by the other witnesses in the case. A different situation might have been presented, had Blackmer been in the place of Sinclair, if we are to consider as admissible the evidence in regard to bonds purchased by the Continental Trading Company and subsequently finding their way into the possession of Fall's relative. For aught we know, there may have been independent business relationships, legitimate or otherwise, between Blackmer and Fall, as neither is made a party to this suit.

As repeatedly stated by the courts, fraud cannot be presumed, but must be proved, and in the manner which has heretofore been announced throughout our entire history of American jurisprudence. It may be admitted that the transaction arouses suspicion, but further than this the court does not feel justified in going toward a finding in favor of plaintiff, in view of the principles of law announced. This court feels that it must be left to some higher court to find from the evidence what seem to be fatal missing links, or to extend the principles of law, so as to cover a situation as it here apparently exists.

The other collateral transaction is the transfer of $25,000 in bonds from Sinclair to Fall in June, 1923, hereinbefore referred to. This may be regarded as a suspicious circumstance; but, having taken place long after the transaction which is here challenged, and the circumstances being explained, it is quite largely removed from the category of a fraudulent transaction in this suit. It was done openly, without any apparent attempt to conceal it. It was explained fully as to its purpose by those who had knowledge of it, which explanation places upon its face the badge of a legitimate transaction. It is common knowledge that government officials and employés frequently leave the government service to accept employment, and more frequently are employed after leaving the service in lines upon which they have acquired some peculiar knowledge and experience while in the service. The evidence is that this transaction developed out of a request from Sinclair to Fall to go with him as an attorney in investigating and securing oil leases in Russia, and that the transfer of bonds was in the nature of a loan, for which a note was given to one of Sinclair's attorneys. The money thus realized was to be used by Fall in making settlement for some land purchases before he went upon the trip. The fact that he did not so use it, in itself, is not necessarily a circumstance out of the ordinary, and neither is it particularly strange that he has not yet repaid it, considering the culmination of circumstances in connection with the entire Sinclair lease matter. Apparently Fall did not try to conceal his accepting employment from Sinclair, as he announced that he was going to secure the consent of the administration before accepting the employment.

While, as before stated, such a circumstance affords ground for suspicion, as it reveals a direct personal connection between Sinclair and Fall, as distinguished from the Continental Trading Company transaction, yet, when the defendant has assumed the burden in this instance placed upon it, and explained the circumstances, it falls short of constituting a fraudulent transaction in connection with the issues here raised. It must follow, therefore, that the allegations of fraud contained in the bill have not been sustained.

### (d) The Legality of the Lease.

Under this head will be considered the attacks made by plaintiff upon the legality of the lease as a valid contract under the act of June 4, 1920. The divergent contentions between counsel for the plaintiff and counsel for the defendant, when analyzed, are substantially as follows: Plaintiff contends that the act of June 4, 1920, is in the nature of a general enabling act, permitting the Secretary of the Navy to do certain things in connection with the naval reserves under the then existing provisions of the general laws; while the defendant contends that the act of June 4, 1920, is a full and complete legislative enactment in itself, directed to a specific subject, and in itself furnishing a full and complete guidance, direction, and authority to the official to whom it presumes to speak.

[12] It is not in dispute here that Congress had the authority to make laws respecting the manner in which reserves should be used or disposed of. It would seem pertinent, therefore, first to determine whether or not this act has in itself the fullness attributed to it by counsel for defendant, be-

fore considering the several objectionable features of the lease in respect to which counsel for the plaintiff contends that the law has been transcended. Reverting to a consideration of the act, it is found that the Secretary of the Navy is affirmatively directed to take possession of the naval reserves. He is next directed to conserve, develop, use, and operate the same. In performing this duty of conserving, developing, using, and operating the reserves, he is permitted to do so directly, or by contract, lease, or other method. As to the product which may be realized from the reserves, he is permitted to use, store, exchange, or sell it for the benefit of the United States. For the purpose of carrying out the duty imposed upon him, an appropriation of $500,000 is made available out of certain funds in the treasury. A proviso is attached that such appropriated sums shall be reimbursed. In between the direction to the Secretary of the Navy as to what he is to do with the reserves and the direction as to the manner in which he is to do it, are found the words "in his discretion."

Some difference of opinion has arisen as to which set of so-called directions this phrase applies; that is, whether it applies to what he is directed to do, or to the manner in which he is to do that which he is directed to do, in connection with the reserves. It is difficult to reconcile its application to the things directed to be done, because they are in the conjunctive; the word "and" appearing immediately before the last of them. This would seem to imply that, if it were possible, he should do all the things named for him to do without the exercise of any discretion on his part, to wit, "conserve, develop, use, and operate." If the word "conserve" be used in its larger meaning, and be held to include the saving from loss, as distinguished from the more limited meaning of holding the content in the ground, then the Secretary could, under a fair construction, conserve, develop, use, and operate all at the same time, or at least the doing by him of the four things would merge one into the other.

If the term "in his discretion" be held to apply to the manner of doing the things he is directed to do, it would more naturally apply, because the manner is indicated in the disjunctive, consisting of four distinct things, to wit, directly, that is, by doing the things under his general supervision, or by contract, or by lease, or otherwise. It will therefore be seen that the term "in his discretion" would logically apply to the direc-

tion of Congress as to the manner in which he is directed to carry out the things which he is directed to do. The difficulty with the latter construction is that there is no comma after the word "same," and that if it were intended to apply to the manner of carrying out his direction, the phrase would more properly find place in the context immediately following the word "otherwise."

However, assuming that the term "conserve" is used in the larger sense which has been indicated, and which meaning we think must be given it in connection with the surrounding circumstances applying to the general purposes which must have inspired the act, this application of the discretion to the four things which the Secretary is directed to do does no violence. This must be the meaning of the term "conserve," when we consider that the other three terms, "develop, use and operate" are so interrelated that it would be difficult to tell when, in doing any one of them, he would not at the same time be doing the other. For example, how could he develop the property without using it? How could he operate it without using it? How could he use it without either developing or operating it? If he should operate it, would he not in a sense be developing it, and vice versa? And if he did all the three for the purpose of saving the product, would he not be conserving it?

As to the manner in which he is directed to dispose of the product, we find this to be also in the disjunctive, and to include four things, to wit, "use," "store," "exchange," or "sell." The word "or," before the latter word, here implies discretion, in that it gave him the right to do any of the four things mentioned, or all of them, if his discretion dictated, provided, of course, that the thing he did was in the nature of carrying out the general purposes of the act. To use the oil and gas product naturally means, in this connection, its application to the naval purposes of the United States; to store the product means placing it in some position for a future use; to exchange the product means transferring it to another and receiving therefor something to be used in carrying out the general purposes of the act; and to sell the product means to dispose of it and receive for it a consideration in money. It is difficult to conceive a more sweeping authority given to the Secretary of the Navy than is contained in these four words, unless to them had been added the authority to give away or destroy.

[13, 14] This construction unavoidably leads to the conclusion that the act empow-

ered the Secretary of the Navy to do specific things in and about a certain subject. But counsel for plaintiff argue that this makes a conflict between this law and some of the general laws prescribing the manner in which certain things must be done by the Secretary of the Navy in the way of advertising for bids for fuel for the navy, the construction of storage tanks at places not designated by Congress, the construction of storage tanks under competitive bidding, and the like. It therefore becomes necessary to ascertain what relationship legislation applying to a particular subject bears to the general laws relating to the same things. Our own circuit, through Judge Sanborn, in the case of Anchor Oil Co. v. Gray, 257 F. 277, 168 C. C. A. 361, has laid down the rule and cited numerous authorities at page 283 (168 C. C. A. 367), in the following language:

"It is a cardinal rule of the construction of statutes that specific legislation in relation to a particular class or subject is not affected by general legislation in regard to many classes of subject, of which that covered by the specific legislation is one, unless it clearly appears that the general legislation is so repugnant to the special legislation that the legislators must be presumed to have intended thereby to modify or repeal it; but the special and the general legislation must stand together, the former as the law of the particular class or subject, and the latter as the general law upon other subjects or classes within its terms. State v. Stoll, 17 Wall. 425, 436, 21 L. Ed. 650; Washington v. Miller, 235 U. S. 422, 427, 428, 35 S. Ct. 119, 59 L. Ed. 295; Harris v. Bell, 250 F. 209, 216, 162 C. C. A. 345; Stoneberg v. Morgan, 246 F. 98, 101, 158 C. C. A. 324; Sweet v. United States, 228 F. 421, 427, 143 C. C. A. 3; Priddy v. Thompson, 204 F. 955, 958, 959, 123 C. C. A. 277, 280, 281; Christie Street Commission Co. v. United States, 136 F. 326, 333, 69 C. C. A. 464, 471."

A syllabus succinctly stating the view of the Supreme Court in the case of State v. Stoll, 17 Wall. 425, 21 L. Ed. 650, reads as follows: "If the provisions of a special charter or a special authority derived from the Legislature, can reasonably well consist with general legislation whose words are not absolutely harmonious with it, the two are to be deemed to stand together; one as the general law of the land, the other as the law of the particular case." As this rule of statutory construction seems to be clearly defined,

a further citation of authorities would unnecessarily prolong this memorandum.

Upon a construction of what the act itself clearly means, and in view of the rule laid down by the courts, it must accordingly be held that the act in question must stand and be construed as a special act, and the things to be done thereunder are taken out of the general laws relating generally thereto, but that in no sense is it to be construed as repealing those general laws, this law only applying to the subject which it specifically treats, to wit, naval reserves.

[15] One of the contentions of counsel for plaintiff, however, is that the word "exchange" should not, in its ordinary and natural construction in the place in which it is found, be held to mean that the Secretary could exchange the royalty oils derived from the land for fuel oil in storage, but that its meaning should be limited to simply the exchange of royalty oils for other oils. We think that an answer to this is that, when the act authorizes the Secretary to store oils, it means that he is enabled to devise ways and means for the purposes of such storage, and further that it is a fair construction to say that he may exchange the oils for anything which in their nature would be carrying out the general purposes of the act. The argument is specious which would attempt to say that, if he were empowered to exchange royalty oil for storage or fuel oil in storage for the purpose of the Navy, he could exchange for a battleship or anything else, as it is clear that this would not be in consonance with the general purposes of the act, to wit, to prevent a loss of the oil and make it available for naval purposes. Again, as to the places of storage, if it devolved upon Congress to designate places of storage in carrying out its direction, then that portion of the act would be a nullity, because Congress had designated no places to store oil.

[16] As to the alleged sale of the royalty oils which counsel for plaintiff contend the contract calls for, and therefore that the proceeds must have been in cash and turned into the treasury, we view the use of the term "sale," as used in the contract, of only comparative significance, but rely more upon a fair construction of what the transaction really was, as gathered from the context. While the lease says that the royalty oils were to be sold to the lessee, it specifies that certificates representing the purchase price should be delivered by the lessee to the lessor, which certificates might in turn be exchanged for fuel oil in storage, to be constructed under a supplemental contract by

the lessee, the exchange for fuel oil at places to be designated, the exchange for gasoline, kerosene, lubricating oils, and other petroleum products required by the Navy, or for cash; these being expressed in the way of options to the lessor.

Under this arrangement the certificates have the character of a representative of value ad interim, and the nature of the transaction which it represents is not really determined until such a time as the lessor exercises the option. If the certificates be used for the liquidation of indebtedness in regard to fuel oil in storage, the transaction is an exchange; likewise with regard to their use for fuel oil furnished for naval purposes at designated points, as well as for securing kerosene, lubricating oils, and the like; but, if the certificates are redeemed for cash, it may then be fairly assumed that the transaction takes on the nature and character of a sale, and in this view it may be conceded that the proceeds in cash realized for such a redemption must be covered into the treasury of the United States, for the reason that the act probably does not go so far as to authorize the expenditure of the cash realized from the sales of the royalty oil.

As to the appropriation made in the act for the purposes of carrying it into effect, it seems to this court that, in the light of the analysis of the act itself, considering that it empowers the Secretary of the Navy to directly develop and operate the lease, as distinguished from doing those things by contract or lease, that it was the clear intention of Congress to make available a reasonable amount to start that development and operation, should he elect to himself assume this burden of its personal direction.

### (e) The Policy of the Government.

[17] In argument and brief concerning the so-called policy of the government in regard to the treatment of the oils in its naval reserves, counsel for plaintiff contend that it was clearly the policy and intent of Congress to have this oil retained in the ground. We cannot follow the argument to this conclusion, for the reason that, as it seems to us, there has been no constant policy. It was originally the policy, under the Placer Mining Act, to give away the oil contained in government lands to the discoverer. In 1909 –10, Congress, realizing the intense monetary value and necessary use for national defense purposes, withdrew its proven oil lands from further entry. They remained in this situation, with the exception of some of these

5 F.(2d)—23

lands being constituted into naval reserves, until the Leasing Act was passed in 1920, which again changed the policy in regard to the oil resources of the government. This latter act was undoubtedly inspired by reason of the fact that numerous private claims interspersing the proven structure so withdrawn were being developed, and Congress realizing that, unless some affirmative action was taken, the oil would be entirely extracted through these private operations, and as a consequence the government would realize nothing from these resources. So the Leasing Act was passed, reserving to the government substantial royalties.

As plans began to develop for the granting of the leases under the general Leasing Act, it was realized that the production in the structures would be increased and the content correspondingly decreased. Lying adjacent to the great Salt Creek field, where the leases were being granted by the hundred, or about to be, Congress realized, judging by the text of the act of June 4, 1920, that there was danger, on account of this intense leasing, of drainage and a loss in the naval reserves themselves, and in consequence passed the act as a remedial measure, for the purpose of taking the oil out if found necessary to save it. From this brief history it would be difficult to say that there had been any uniform policy of the government or Congress in regard to dealing with its petroleum resources, unless it should be considered a general policy to prevent private enterprise from getting away with its oil.

Little weight can be attached to any declaration of policy by Congress a considerable time after the act was passed, especially in view of the fact that reports concerning fraud surrounding the lease reached the ear of Congress, and disturbed the equilibrium of that body, perhaps justly so, because of having no way to legally determine the matter in which it was deeply concerned. That function is vested in the courts. Koshkonong v. Burton, 104 U. S. 668–678 (26 L. Ed. 886).

"When counsel, in Ogden v. Blackledge, 2 Cranch, 272, 277, announced that to declare what the law is, or has been, is a judicial power, to declare what the law shall be is legislative, and that one of the fundamental principles of all our governments is that the legislative power shall be separated from the judicial, this court interrupted them with the observation that it was unnecessary to argue that point."

### (f) The Motion to Strike.

[18] The heretofore considered and disposed of Continental Trading Company transaction was based upon the assumption, of course, that the books and records of brokers and banks concerning the handling of bonds, purporting to have passed through the Continental Trading Company, had been admitted in evidence. This evidence was objected to by counsel for defendant, received subject to such objection by the court, and at the close of the case it was again attacked by motion to strike. In the view which the court has taken of the entire transaction, considering this evidence as being admitted in the case, it is of little consequence in reaching a conclusion as to what should be done with the motion to· strike. However, for the purpose of making the record, it will be briefly considered.

The motion has as its basis two grounds: First, that all of this evidence is inadmissible, because falling within the rule that such records are "res inter alios acta"; and, second, that much of this evidence was objectionable for the reason that it was additionally of a hearsay character, because the parties who purported to testify to it had no personal knowledge of the books and records themselves. The court considered this question upon the trial, and made a tentative ruling, citing some authorities expressing views upon the subject. While the first question has not been passed upon in late years in our circuit, the case of Board of Commissioners v. Keene, 108 F. 505, seems to recognize the doctrine contended for by defendants, and therefore, for the purpose of making the record, so that the appellate court may pass upon it if it may be so advised, the motion to strike will be sustained upon this first ground. The second point affects a small portion of the evidence.

### Conclusion.

Not all of the questions have been specifically treated in this memorandum, as the briefs are long, and the many individual legal questions have been most ably and exhaustively presented; but enough of them have been considered to enable the court to arrive at a conclusion.

In reaching a conclusion in this case, we fully realize the degree of unpopularity with which it will be received. This is true in the nature of things, because the great general public is reached only with the sensational features surrounding the transactions involved, and being largely in the dark as to all the other multitude of circumstances with which the case is surrounded, and knowing perhaps less of the great legal principles which the experience of the ages has taught mankind must control in dealing with the rights of persons and property.

The fact that this appears to be a good contract for the government, as testified to by those witnesses who are qualified to speak of its character, coupled with the fact that the courts should be concerned in sustaining formal grants upon which the rights and welfare of many may depend, impels the conclusion that such contracts should not be set aside for light or frivolous reasons, unless fraud in connection with their execution is clearly shown.

[19] We have no quarrel with the theory that the Congress should have and has the constitutional power to regulate the manner in which the property of the United States shall be handled by the executive branch, but we do maintain that in the exercise of that power it may by appropriate legislative authority delegate officers of that department to handle government property in an unrestricted way and in accordance with a vested discretion. Therefore it is not only possible, but very probable, in this case, that the action taken by the Secretary of the Navy, if the contracts are fairly and honestly carried out, will actually conserve oil which would otherwise have been lost, had not such action been taken, for as to how far-reaching drainage may be, and how far oil pools extend underground, is at present little known, even by geologists themselves.

A decree may be presented with findings and conclusions consistent with this memorandum, dismissing the bill of complaint, and reserving to each of the parties exceptions in those matters where rulings have been adverse.